PRESENT:  All the Justices

COMMONWEALTH OF VIRGINIA

OPINION BY
JUSTICE CLEO E. POWELL

v.  Record No. 240326

MAY 29, 2025

JAMAR PAXTON

FROM THE COURT OF APPEALS OF VIRGINIA

The Commonwealth of Virginia appeals the decision of the Court of Appeals reversing

the convictions of Jamar Paxton ("Paxton") on the grounds that the trial court improperly

allowed the jury to hear incriminating statements made by Paxton in violation of his right to

remain silent.

## I.  BACKGROUND

In May 2020, police arrested Paxton for robbery and use of a firearm following the death

of his girlfriend, Dominique Danzy ("Danzy").  Detective James Baynes ("Det. Baynes")

interrogated Paxton at the police station.  During the interrogation, Det. Baynes informed Paxton

of the evidence against him and accused him of murdering Danzy.  After Paxton repeatedly

denied killing Danzy, the following exchange occurred:

> Paxton: Sir I did not shoot her.
>
> Det. Baynes: You did shoot her.
>
> Paxton: I don't wanna talk no more.
>
> Det. Baynes: Ok, that's fair enough, absolutely fair enough. I gave
> you the opportunity to talk, you didn't want to talk, and that's fine,
> so you're being charged right now with the carjacking of the car,
> and use of a firearm in the commission of a felony, and you will be
> taken to the magistrate and processed.
>
> Paxton: Sir.

Det. Baynes: Yes.

Paxton: What?

Det. Baynes: Mmm-hmm, unless you can come up with a reasonable explanation, . . .

Paxton: Sir, what else do you wanna know? I'm tellin[g] you everything.

Det. Baynes: I wanna hear the truth.

Det. Baynes then continued interrogating Paxton. Eventually, Paxton made several incriminating statements about his involvement in Danzy's death.

Prior to trial, Paxton moved to suppress his incriminating statements, arguing that he had invoked his right to remain silent, but Det. Baynes failed to stop the interrogation. At a hearing on the matter, the trial court agreed that Paxton had unequivocally invoked his right to remain silent. However, it denied the motion to suppress, finding that Paxton voluntarily reinitiated the interrogation when he asked Det. Baynes, "What?"

At trial, the Commonwealth presented evidence establishing that Paxton purchased a .22 caliber rifle and a box of .22 caliber ammunition on May 12, 2020. At the time that he made the purchase, he was accompanied by Danzy. Additionally, the jury heard evidence establishing that the last time anyone heard from Danzy was via a text message she sent to her brother at around 7:30 p.m. on the evening of May 12, 2020. Danzy's brother also testified that Danzy had only one set of keys for her car, and she kept them on a "puff ball" key chain.

On May 13, 2020, Danzy's body was found. It was later determined that she had gunshot wounds on her lower back and buttocks and a single "[i]mmediately fatal" gunshot wound on the left side of her head. Three .22 caliber cartridge casings were found eight to ten feet away from Danzy's body. The cartridge casings were later determined to have been fired from the rifle purchased by Paxton.

That night, Danzy's car was found near an Econo Lodge hotel in western Henrico County. Cartridge casings that were determined to have been fired from the rifle Paxton had purchased were found in the backseat of the car. In the trunk, police found a box with the rifle that Paxton had purchased the day before in it, as well as a partially empty box of .22 caliber bullets. The box had blood stains on the inside of it and the rifle had multiple red stains, later determined to be blood, on it. Subsequent testing of the blood stains on the rifle revealed that it was Danzy's blood. Additionally, DNA from both Paxton and Danzy was found on the trigger, grips, and magazine of the rifle.

On May 15, 2020, police found Paxton at a hotel in Colonial Heights. When he was arrested, Paxton was wearing a backpack. A subsequent search of that backpack revealed Danzy's car keys on her "puff ball" key chain and a .22 caliber cartridge casing. The .22 caliber cartridge casing was later determined to have been fired from the rifle Paxton had purchased on May 12, 2020.

The Commonwealth also played a recording of Det. Baynes's interrogation of Paxton. In the recording, Paxton initially stated that, on May 12, 2020, he had spent the morning with Danzy, but she dropped him off at around 2 p.m. and that was the last time he saw her. It was also mentioned in the recording that Paxton had stayed at the Econo Lodge near where Danzy's car was found on that same night. He further claimed that he learned about Danzy's murder on the news.

Further in the video, after Paxton had invoked his right to remain silent, Det. Baynes suggested that he had acted in self-defense when he shot Danzy. Paxton then admitted that he shot Danzy. According to Paxton, Danzy shot at him with the rifle and then charged at him. He then took the rifle from her and pushed her away. Paxton claimed that she charged at him again

3

and that is when he shot her. Paxton insisted that he did it because he was scared that she was going to kill him.

After the Commonwealth presented its evidence, Paxton took the stand in his own defense. He unequivocally stated that he did not kill Danzy. According to Paxton, he last saw Danzy at 2:00 p.m. on the day she was killed and that he did not learn of her murder until the next day. He claimed that he tried to tell Det. Baynes that he was innocent, but Det. Baynes would not accept that answer. Paxton stated that he believed that the only way that he could get Det. Baynes to stop the interrogation was to falsely admit to killing Danzy. When questioned about the car keys found in his backpack, Paxton had no answer. Paxton also presented evidence indicating that he had an increased likelihood of giving a false confession due to a variety of factors.

During closing arguments, the Commonwealth primarily focused on the evidence against Paxton. The Commonwealth did mention the statements that Paxton made to Det. Baynes, but it specifically discounted the importance of those statements, noting:

> you can convict the defendant without even considering his statement to Detective Baynes. The evidence is [sic] in this case is so strong, the fact that he admitted that he killed her is really just icing on the cake. Without ever considering that statement, the evidence is far beyond a reasonable doubt for you to find that this person is the man who killed [Danzy].

After deliberating, the jury found Paxton guilty of second-degree murder and use of a firearm in the commission of murder. Paxton was subsequently sentenced to imprisonment for 33 years with 16 years suspended.

Paxton appealed to the Court of Appeals arguing that the trial court erred in denying his motion to suppress his incriminating statements. The Court of Appeals agreed with the trial court "that Paxton unambiguously invoked his right to remain silent." *Paxton v. Commonwealth*,

4

80 Va. App. 449, 460 (2024). However, the Court of Appeals ruled that Det. Baynes failed to stop the interrogation when Paxton invoked his rights. *Id.* at 463. The Court of Appeals noted that "an objective observer would conclude that Baynes's request for 'a reasonable explanation' of the evidence he presented to Paxton was designed to elicit an incriminating response and was therefore interrogatory." *Id.* It explicitly rejected the Commonwealth's assertion that Paxton voluntarily reinitiated the interrogation when he asked Det. Baynes "what," noting that "neither we nor the Supreme Court have ever held that a suspect reinitiated an interrogation based on so vague a statement." *Id.* at 463-64. The Court of Appeals went on to hold that the denial of the motion to suppress was not harmless error because "Paxton's incriminating statements that he killed Danzy were powerful evidence in a case in which the prosecution's remaining evidence was solely circumstantial." *Id.* at 465. The Court of Appeals also held that Paxton did not waive his challenge to the introduction of his confession by testifying. *Id.* at 466. According to the Court of Appeals, the admission of "illegally-obtained evidence" impelled Paxton's testimony and, therefore, the same-evidence principle did not operate to waive Paxton's objection in this case. *Id.*

The Commonwealth appeals.


II.  ANALYSIS

On appeal, the Commonwealth argues that the Court of Appeals erred in ruling that Det. Baynes failed to stop the interrogation when Paxton invoked his rights. According to the Commonwealth, the record establishes that Det. Baynes ended the interrogation, but Paxton reinitiated the conversation. The Commonwealth further claims that the Court of Appeals applied the wrong standard of review because it incorrectly relied on *Overbey v. Commonwealth*,

5

65 Va. App. 636 (2015), and *Rashad v. Commonwealth*, 50 Va. App. 528 (2007). The

Commonwealth also asserts that, under the same evidence rule, Paxton waived any objection to

the use of his statements to Det. Baynes due to the fact that Paxton testified about the interview.

Under the specific facts of this case, however, it is unnecessary for the Court to address any of

these arguments because any error in admitting Paxton's statement was ultimately harmless.

As we have repeatedly admonished, "[w]e will not reverse a trial court for evidentiary

errors that were harmless to the ultimate result." *Shifflett v. Commonwealth*, 289 Va. 10, 12

(2015). Upon the determination that a trial court has erred, an appellate court is required to

determine whether the error is harmless. *See* Code § 8.01-678 ("When it plainly appears from

the record and the evidence given at the trial that the parties have had a fair trial on the merits

and substantial justice has been reached, no judgment shall be arrested or reversed . . . [f]or

any . . . defect, imperfection, or omission in the record, or for any error committed on the trial.").

"When a Virginia appellate court conducts harmless error review, the standard it applies depends

on the type of error being reviewed." *Welsh v. Commonwealth*, 304 Va. ___, ___ (2025). Where

the trial court's error "is not of a constitutional dimension, . . . [a]n appellate court can conclude

that a non-constitutional error is harmless 'if it can conclude that the error did not influence the

jury or had but slight effect.'" *Id.* (quoting *Commonwealth v. Kilpatrick*, 301 Va. 214, 216

(2022)).

However, where, as here, the error is constitutional in nature, "the harmless-error

standard . . . ask[s] 'whether there is a reasonable possibility that the evidence complained of

might have contributed to the conviction[.]'" *Commonwealth v. White*, 293 Va. 411, 420-21

(2017) (quoting *Chapman v. California*, 386 U.S. 18, 23 (1967)). Under this standard, we do not

"presume that an error cannot be harmless if the factfinder considered erroneously admitted

6

evidence." *Id.* at 421. Rather, we must determine whether it is "'clear beyond a reasonable doubt that a rational [factfinder] would have found the defendant guilty absent the error.'" *Id.* at 422 (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)).[1]

> In making that determination, the reviewing court is to consider a host of factors, including the importance of the tainted evidence in the prosecution's case, whether that evidence was cumulative, the presence or absence of evidence corroborating or contradicting the tainted evidence on material points, and the overall strength of the prosecution's case.

*Lilly v. Commonwealth*, 258 Va. 548, 551 (1999) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

Here, the Court of Appeals determined that the trial court erred by denying Paxton's motion to suppress the incriminating statements he made to Det. Baynes after he invoked his right to remain silent. *Paxton*, 80 Va. App. at 465. In performing its constitutional harmless error analysis, the Court of Appeals does not appear to have considered any of the factors described in *Lilly*. The only articulated basis for its decision was the fact that "Paxton's incriminating statements that he killed Danzy were powerful evidence in a case in which the prosecution's remaining evidence was solely circumstantial." The mere fact that the evidence of Paxton's guilt was circumstantial is not, as the Court of Appeals implies, dispositive of a harmless error analysis. As this Court has long recognized, "[c]ircumstantial evidence is as acceptable to prove guilt as direct evidence." *Parks v. Commonwealth*, 221 Va. 492, 498 (1980).

Assuming, without deciding, that the Court of Appeals was correct in its determination that the motion to suppress should have been granted, we do not agree with its harmless error analysis. Therefore, it is necessary for us to apply the factors discussed in *Lilly* and determine if

---

[1] This standard is distinguishable from the sufficiency of the evidence standard, which looks only at whether the factfinder "*could have* found the defendant guilty." *White*, 293 Va. at 422 (emphasis in original).

7

it is clear beyond a reasonable doubt that a rational jury would have still found Paxton guilty, even in the absence of the statements he made to Det. Baynes. *See, e.g.*, *White*, 293 Va. at 422 (explaining that while "[t]he sufficiency [of the evidence] standard asks whether a rational jury *could have* found the defendant guilty[, t]he harmless-error standard . . . instead looks at the other side of the reasonable-doubt spectrum[, asking]: '[i]s it clear beyond a reasonable doubt that a rational [factfinder] *would have* found the defendant guilty absent the error?'") (emphasis in original) (collecting cases).

Looking first at the importance of Paxton's admission to Det. Baynes, the record establishes that it was not as significant to the Commonwealth's case as the Court of Appeals states. Indeed, during its closing argument, the Commonwealth explicitly downplayed the importance of Paxton's admission to Det. Baynes, focusing instead on the physical evidence tying Paxton to the murder. The Commonwealth relied on the evidence showing that Paxton and Danzy were together when he purchased the rifle. It noted that Danzy's car was found near the hotel where Paxton stayed on the night Danzy died. The Commonwealth discussed the fact that Paxton's rifle was found in Danzy's car with her blood on it and his DNA on the trigger. The Commonwealth also pointed out that Danzy's car keys were found in Paxton's backpack, along with another cartridge casing matching the caliber of the rifle. Finally, the Commonwealth reiterated its forensic evidence demonstrating that every cartridge casing that was found as part of its investigation was fired from Paxton's rifle.

It is further worth noting that Paxton's statements to Det. Baynes were inconsistent with the forensic evidence presented by the Commonwealth. For example, Paxton told Det. Baynes that he shot Danzy in self-defense when she ran towards him after he took the rifle away from her. Yet, it is undisputed that Danzy was shot five times in the lower back and buttocks and once

in the side of her head. If, as Paxton claimed, Danzy was running towards him, her wounds would not be on her back and side; they would be in the front. Viewed through this lens, it is apparent that these obvious inconsistencies contradict Paxton's statement and significantly diminished the import of Paxton's admission.

As to the overall strength of the Commonwealth's case, it is clear that, even if Paxton's admission is excluded, the Commonwealth proved its case beyond a reasonable doubt. The undisputed facts establish that Paxton's rifle, which he purchased with Danzy, was the murder weapon. When Danzy's body was found, her car keys, cellphone and car were missing. Police later found Danzy's locked car parked near the hotel where Paxton had stayed on the night of the murder. In Danzy's car, police recovered Paxton's rifle. The rifle was in its original box which was covered in Danzy's blood. Additionally, Danzy's blood was found on Paxton's rifle. Further, Paxton's DNA was found on the trigger of the rifle. Other than DNA from Paxton and Danzy, no other relevant DNA was found on the rifle.[2] When Paxton was arrested, Danzy's key chain with her car keys on it was found in the backpack he was wearing. Notably, there was testimony that Danzy only had one set of car keys. A cartridge casing was also found in the backpack. Forensic analysis later established that the cartridge casing had been fired from Paxton's rifle.

> When the evidence is wholly circumstantial, as here, all necessary
> circumstances proved must be consistent with guilt and
> inconsistent with innocence and exclude every reasonable

---

[2] The Commonwealth's DNA expert acknowledged that there were "additional DNA types" which could not "be accounted for by Paxton or Danzy." However, the expert noted that that these additional DNA types amounted to a "a very miniscule amount of DNA." The expert then discussed the concept of "transfer DNA," and used the example of DNA transferred from the person who sold the rifle. Taken as a whole, the expert's testimony implied that the additional DNA types found on the rifle were insignificant and, therefore, the presence of the additional DNA types does not affect our analysis in this case.

> hypothesis of innocence. The chain of necessary circumstances must be unbroken. Nevertheless, it is within the province of the jury to determine what inferences are to be drawn from proved facts, provided the inferences are reasonably related to those facts. The burden is upon the Commonwealth to prove beyond a reasonable doubt that motive, time, place, means, and conduct concur in pointing out the accused as the perpetrator of the crime.

*Inge v. Commonwealth*, 217 Va. 360, 366 (1976) (citing *Boykins v. Commonwealth*, 210 Va. 309, 312 (1969)).

Taken together, the evidence presented at trial lends itself to only a single logical conclusion: that Paxton killed Danzy with his rifle, left the scene in her car, and subsequently abandoned it a short distance from the hotel where he was staying that night. The alternative, that someone else[3] killed Danzy with Paxton's rifle, left the scene in her car, abandoned it a short distance from the hotel where Paxton happened to be staying, and then surreptitiously planted Danzy's keys and a spent cartridge casing in Paxton's backpack, strains all credulity. Indeed, there is no evidence in the record, either physical, direct (actual), or circumstantial, supporting such a theory. Accordingly, the overall strength of the Commonwealth's case, when combined with the limited import of Paxton's statements, establishes that any error was harmless beyond a reasonable doubt.

## III. CONCLUSION

Having determined that any error in allowing the jury to consider the statements Paxton made to Det. Baynes after he had invoked his right to remain silent was harmless, we will reverse the decision of the Court of Appeals and enter final judgment affirming Paxton's convictions.

*Reversed and final judgment.*

---

[3] At trial, Paxton sought to place the blame on Danzy's stepfather.

10